THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* CHESTER EVANS, Defendant-Appellant.—THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* LAWRENCE GRIFFIN, a/k/a Lawrence Cain, Defendant-Appellant.

First District (5th Division) Nos. 60007 and 60008

Opinion filed July 23, 1976.—Modified upon denial
of rehearing September 3, 1976.

16

David Lincoln Ader, of Chicago, for appellant Chester Evans.

James W. Reilley, of Reilley, Bell & Weinberg, of Chicago, for appellant Lawrence Griffin.

Bernard Carey, State's Attorney, of Chicago (Laurence J. Bolon and Linda Ann Miller, Assistant State's Attorneys, of counsel), for the People.

Mr. PRESIDING JUSTICE LORENZ delivered the opinion of the court:

Following a jury trial, defendants were convicted of two counts of murder resulting from the deaths of William McFall and Louis Barnette in violation of section 9—1 of the Criminal Code of 1961. (Ill. Rev. Stat. 1973, ch. 38, par. 9—1.) Both defendants were sentenced to terms of 30 to 90 years for each offense, the sentences to run concurrently.

We note at the outset that in the interest of judicial economy and since no useful purpose would be served by twice repeating the testimony adduced at the trial of these co-defendants, we have issued our opinions in both cases together in this form. Each appeal has received separate consideration by this court, however, and as our title indicates the appeals

have not been consolidated for review. Whenever similar contentions in these opinions have been raised we have discussed their disposition as they apply to each defendant individually.

On appeal defendants both contend that the trial court erred when it: (1) denied them a fair trial by allowing the State to employ several prejudicial trial tactics, (2) adjudged them guilty beyond a reasonable doubt, and (3) conducted an improper poll of the jury.

Defendant Evans additionally contends that he was prejudiced when the trial court failed to inquire throughout the course of the proceedings whether the jury had read an allegedly prejudicial newspaper article about the trial. Defendant Griffin, also known as Cain (Griffin), contends that the evidence failed to establish a sufficient chain of custody for the admission of certain bullets and cartridge casings into evidence.

The following pertinent evidence was adduced at trial.

*For the State:*

*Robert Lee Johnson*

On November 29, 1969, between 11 p.m. and midnight, he was visiting a friend at 1031 East 46th Street. While he was standing inside a doorway several young men whom he did not recognize at the time emerged from an alley across the street and proceeded to a hotel building at 1028 East 46th Street. When he heard shots he walked out of the doorway and around the corner of the building to a point approximately 12 to 15 feet from where defendants were standing. The only illumination was a light over the door at the 1028 building. He identified both Griffin and Evans as being two of the people firing shots into the building. They were the two tallest members of the group. He had known Evans prior to that evening, probably for months. He observed the shooting for about 60 seconds. After the shooting he spoke with Jacqueline Walker, Ellis "Tee" Walker, her husband, and Steve "Maniac" Foley on 46th Street. Louis Barnette's body was lying in the doorway at 1028. He recognized a picture of Griffin which he had identified in May, 1970 while he was living in Texas.

On cross-examination he initially stated that the hotel at 1028 was on the south side of 46th Street, but after considering the location in relation to 47th Street he stated that it was probably on the north side of the street. Evans wore something red on his head which covered his hair. He could not otherwise describe what Griffin or Evans were wearing. He admitted lying to the police at first when he told them "I didn't see nothing." He also told a lie detector examiner that he could not identify any of the murderers. He signed a statement implicating Evans on December 9, 1969, after speaking with Officers Boyle and Manion. Although he had seen Evans many times he had only met him once or twice "at meetings." He admitted telling the grand jury that he had known Evans for about

two years. Griffin was wearing a hat in the photograph he was shown in Texas.

On redirect he stated he did not know the results of the lie detector test when he decided to implicate Evans to Officers Boyle and Manion. He lied to the police at first because "[t]he dudes was in my club * * * . We were good friends." He did not know Griffin's name until December 9, 1969.

### Alvin Cargill

On January 19, 1970, he purchased a blue steel, automatic pistol from a Lawrence Cain in a tavern in Chicago. When asked to identify Griffin at trial, he said "the boy with the beard on, I think it's the third one, Cain, with a gap in his teeth." Thereupon, Evans stood up and identified himself. The witness then said, "No, it's Cain, with the beard." Thereupon, Cain arose and identified himself. People's Exhibit 6 was the pistol he purchased. He later gave the pistol to Albert Vernon in about February 1970.

### Albert Vernon

In February 1970, Alvin Cargill gave him a .32 automatic pistol. The police recovered that pistol on March 3, 1970, when they arrested him.

Thereafter, by the testimony of Andrew McFall and by stipulation to the testimony of Rosetta Pritchett, the deceaseds' lives and deaths were evidenced.

On the morning of the second day of trial defendants requested the court to inquire of the jurors as a whole whether any juror had read anything about the case. Defendants were concerned about an article which had appeared in that morning's edition of the CHICAGO TRIBUNE. After the court so inquired and ascertained that no juror had read the article, it stated "There was an article in this morning's TRIBUNE. I don't want you to read it. I am instructing you not to read it * * * there is erroneous information contained therein." Defense counsel thereupon objected because the jury had been apprised of what paper the article appeared in. The trial court again admonished the jury not to read any newspapers during the trial and the trial continued.

### Dr. Edward Shalgos

He is the forensic pathologist who conducted the internal and external examinations of the deceaseds' bodies. Louis Barnette suffered four wounds related to three bullets. Barnette's death was caused by a bullet which lacerated the left lung. Similarly, William McFall suffered eight bullet wounds. McFall's death was caused by two chest wounds. He identified the bullets which he had removed from the bodies.

*Officer Albert Smith, a Chicago Police Department investigator*
On the night of this incident he observed Barnette's body lying outside the doorway and found McFall sitting unconscious on a couch. He identified three .32 caliber shells which he had recovered inside the hallway and on the lawn outside the building.

*Rudolph Anders, a Chicago Police Department technician*
He recovered three bullets at the scene and transported them to the crime laboratory.

*Officer Alphonso Hines*
He has been a Chicago policeman for 5½ years. He arrested Albert Vernon on March 3, 1970. He identified the pistol which he recovered at that time. He did not request that the pistol be examined for latent fingerprints.

*Sergeant Vince Lamora*
He had been assigned the the Police Department's Criminalistics Division for eight years. He identified the bullets, cartridge casings and spent bullets recovered in this investigation. The bullets marked A, D, E, F, M, N and O were all .32 caliber bullets.

*Donald Smith, a Chicago Police Department firearms identification technician*
He identified the .32 caliber automatic pistol as the weapon he had received for examination in an unrelated case. In his opinion, bullets A, F, M and N which were recovered from Barnette's body were fired from the pistol. He admitted that he had not dusted either the cartridge casings nor the pistol to discover any latent fingerprints.

*Sergeant Michael Boyle*
He had been a Chicago police officer for twelve years. He identified ten photographs of Negro males which he had shown to Robert Lee Johnson in Texas on May 23, 1970. He admitted that Evans was not arrested until May 25, 1970, despite Johnson's implicating statement on December 9, 1969. He had three interviews with Johnson prior to December 9, 1969 during which Johnson did not implicate either defendant.

*For defendants:*
*Richard Davis*
He was the Dean of the School of Education at the University of Wisconsin at Milwaukee. He recruited Evans to work in a community program in November, 1969. Although they met on a daily or every other

day basis, he did not know whether Evans was in Milwaukee on November 29 or 30, 1969. Those days occurred during Thanksgiving weekend that year. On cross-examination, he stated that although he knew who Reverend John Fry was, he had not worked with him in Hyde Park. He admitted recruiting Evans because Evans was a person who "had a lot of experience on the streets."

### Arlander Wade
Although he and Evans had access to an automobile for trips to Chicago they were in the Turning Point Lounge in Milwaukee between 11 p.m. and 1 a.m. on the evening of November 29, 1969.

### Defendant Chester Evans on his own behalf
He was working and living in Milwaukee during November and December 1969. He admitted that he would have to guess whether he was in the lounge on any other evening, but he was sure he was present on that night. He was in Chicago on Thanksgiving and Christmas that year, but he later recalled leaving Chicago before November 29 to return to Milwaukee. He denied shooting either Barnette or McFall.

### Defendant Lawrence Griffin on his own behalf
He denied being involved in this incident and selling the gun to Cargill. He could not recall where he was on the night of November 29, 1969.

### Jacqueline Walker
On the evening of November 29, 1969, she was walking east on the north side of 46th Street. She heard shots and saw five or six men shooting towards the hotel at 1028. She was about 50 feet away at that time. The men were approximately 5'7" or 5'8" tall and wore dark jackets and dark Big Apple hats. Neither defendant was among the group of men. Although she gave the police her name, address, and phone number, she was only interviewed once, on the following day. Both defendants were her friends and she knew the deceaseds as well. She later added that both defendants were over six feet tall.

On cross-examination, over defense objections, she was allowed to state that Steve "Maniac" Foley was currently in jail. She admitted that the men ran away from where she was standing after the shooting ceased. She did not see any of the guns that were used.

At the conclusion of the trial, the signed jury verdicts were read in open court. The court thereupon inquired if "This is the verdict of all of you?" to which the jury affirmatively responded in unison. No dissenting voice was heard. Defendants requested that the jury be polled. Ten of the 12 jurors were then polled and again responded in the affirmative. An 11th

juror was also polled, but the record shows that his name did not appear on any of the signed verdicts. Defendants did not object to this procedure nor request that the remaining two jurors be polled. Before discharging the jury, the trial court asked if the jury members wished to inquire about court matters not involved in the case.

OPINION

■■ Defendants first contend that they were denied a fair trial by several prejudicial references to possible gang membership and activities. We note at the outset that several of these references were not objected to during the trial, *e.g.*, Johnson's testimony that he belonged to the same "club" and the possible involvement of Reverend John Fry, a controversial minister who worked with street gangs, in Dean Davis's Hyde Park programs. It is well settled that statements not objected to at trial are waived for review. (*People v. Weaver*, 8 Ill. App. 3d 299, 290 N.E.2d 691.) Defense objections to other questions dealing with Johnson's eventual move to Texas and the location of the gang's headquarters were sustained and the jury was later instructed to disregard these matters. We do not believe that the prejudice of the jury was so aroused by these questions that the admonitions given were not sufficient to preserve a fair trial.

■■■ We have also reviewed the opening and closing arguments for the State portions of which defendants contend were improper. During opening argument the State's Attorney described witness Robert Lee Johnson and stated he "himself" was a member of a street gang. It would require speculation to assume that the jury tied possible gang involvement to defendants through the use of a reflexive pronoun used to describe a potential witness. Moreover, we believe that by its very isolated nature the statement, if erroneous, would be harmless error at worst. In closing argument the State's Attorney mentioned "street" activity and referred to Evans as "Mr. Street." We believe that these terms were proper where defendant's own witness described Evans's expertise as being based upon "a lot of experience on the streets." The State may properly argue from facts and circumstances of record. *People v. Palmer*, 47 Ill. 2d 289, 265 N.E.2d 627, *cert. denied*, 402 U.S. 931, 28 L. Ed. 2d 866, 91 S. Ct. 1532.

■■ Griffin additionally argues that the State's reference to him in closing argument as being a "bum" was improper. We are aware that the State's reference is consistent with Griffin's own counsel's characterization of Griffin as being a "mope." Nonetheless, while we do not believe that the reference constitutes reversible error, we do agree with the court in *People v. Terrell*, 62 Ill. 2d 60, 338 N.E.2d 383, that such statements can be needlessly harsh and should be communicated to the jury in a different fashion. See *People v. Halteman*, 10 Ill. 2d 74, 139 N.E.2d 286 (defendant

fairly characterized as "moron"), and *People v. Wright*, 27 Ill. 2d 497, 190 N.E.2d 287, *cert. denied*, 375 U.S. 925, 11 L. Ed. 2d 167, 84 S. Ct. 271.

■■ Evans individually contends that the trial court had an obligation to interrogate the jury *sua sponte* each successive day of the trial to ascertain whether they had read the newspaper article. Defendant has cited no authority for this proposition. It is true that a criminal defendant should be protected from the prejudicial effects of such articles. (*People v. Cain*, 36 Ill. 2d 589, 224 N.E.2d 786.) Here, the trial court asked if any juror had read the specific article and ascertained that they had not read it. Thereupon, the court admonished them "* * * until this case is over * * * refrain from reading any newspapers. * * * I don't want you to read it. * * * information in the article apparently was erroneous * * * ." Later that morning the court again inquired of the jurors and again admonished them not to read any newspapers until the trial was concluded. At no time during the following days of trial did Evans request that any further inquiry be made nor offer to establish that any real prejudice did in fact occur. For these reasons we reject Evans's contention that the trial court had a continuing duty to inquire about the article.

■■ Defendants next contend that they were not proved guilty beyond a reasonable doubt. Evans argues that Johnson's identification was incredible because he originally lied to the police, did not identify Evans until eleven days after the incident, and did not know Evans well enough to make a positive identification. Evans further argues that the conflicting testimony of Jacqueline Walker and Dean Davis raises a reasonable doubt as to his complicity in the crimes. The weight to be given conflicting testimony was a question for the jury who was able to observe the demeanor of all witnesses and assess their credibility. (*People v. Gamboa*, 30 Ill. App. 3d 242, 332 N.E.2d 543.) The testimony of a single credible eyewitness is sufficient to support a conviction. (*People v. Chatman*, 32 Ill. App. 3d 506, 336 N.E.2d 153.) In *People v. Adams*, 8 Ill. App. 3d 8, 288 N.E.2d 724, the credibility of the single identifying witness was similarly challenged on appeal and this court stated:

> "The testimony of Verna White was clear, positive, and convincing. The fact that she was a prostitute and originally had given a false statement to the police was fully presented to the jury. The jury, nevertheless, found that her testimony was credible, and we believe that such a determination was proper." (*People v. Adams*, 8 Ill. App. 3d 8, 12, 288 N.E.2d 724, 727.)

Similarly, the jury in the instant case observed the demeanors of Johnson, Officer Boyle and Evans, and considered Evans's theory regarding the weakness of Johnson's identification. The jury's ultimate determination of

the facts was not so improbable and contrary to human experience that its findings must be reversed.

Moreover, the illumination and the period of observation provided an adequate basis for the jury to find that Johnson was able to positively identify Evans as one of the gunmen. On appeal Evans has urged this court to take judicial notice of certain maps of the area and to apply a system of triangulation and the Pythagorean theorem to discredit Johnson's testimony on the distance from which he viewed the shootings. Evans had ample opportunity to present this matter to the jury at trial and did, in fact, conduct an adequate cross-examination of Johnson at that time. We will not consider an argument and factual matter raised for the first time on review. *People v. Wilson,* 29 Ill. App. 3d 1033, 332 N.E.2d 6.

■■ Griffin argues that the combination of Johnson's identification testimony and the evidence linking him to the murder weapon were insufficient to support his conviction. Once again, we believe that the weight to be given Johnson's identification based upon his brief view of a man he had never met before was a matter for the jury. Similarly, we recognize that Cargill's testimony about the sale of the pistol some seven weeks after the incident is only circumstantial evidence of actual possession and use by Griffin on the night of the murders. Nonetheless,

> "* * * the question is not whether the gun was in the possession of the defendant, but rather whether the gun had been sufficiently connected with the crime and the defendant to make it relevant as evidence." (*People v. Jones,* 22 Ill. 2d 592, 600, 177 N.E.2d 112, 116.)

We believe that the evidence establishing the pistol as the murder weapon and the testimony by Cargill that Griffin sold the murder weapon were probative on the question of Griffin's guilt. We conclude, therefore, that there was ample evidence to find Griffin guilty beyond a reasonable doubt.

■■ In addition, Griffin has individually contended that the evidence failed to establish a sufficient chain of custody for the admission of certain bullets and cartridge casings into evidence. To the contrary we believe that the recovery and ballistics testimony of Officers Lamora, Anders, Albert Smith, Donald Smith and Doctor Shalgos established a sufficient foundation. *People v. Hines,* 131 Ill. App. 2d 638, 267 N.E.2d 696.

■■ Defendants finally contend the trial court erred by conducting an improper jury poll. After the written verdicts signed by all twelve jurors were returned, the trial court questioned the jury *en masse* as to whether this was indeed their verdict. In unison, the entire jury orally responded in the affirmative. No dissenting voice was heard. Defendants' counsel, who

was present throughout the entire polling procedure, did not object when the court subsequently polled only eleven persons. Similarly, he did not raise this contention in his oral post-trial motion. Consequently, we believe that defendants have waived this issue for review. (See *People v. Herron*, 30 Ill. App. 3d 788, 332 N.E.2d 623; *Goldstein v. Smith*, 85 Ill. App. 588.) If defendant had objected as required, the trial court could have corrected any oversight, and the record would then clearly display whether any possible conflict did in fact exist. Nor do we believe that the possible failure to individually poll two jurors after orally polling the jury *en masse* constitutes such an impediment to defendants' substantial right to poll the jury that the question can now be preserved for review under the plain error doctrine. Ill. Rev. Stat. 1975, ch. 110A, par. 615(a).

*People ex rel. Paul v. Harvey*, 9 Ill. App. 3d 209, 292 N.E.2d 124, is factually distinguishable from the case at bar. In that case, we held the trial court's language foreclosed a juror from the opportunity to dissent from the written verdict. Here, the trial court not only accepted written verdicts, oral verdicts *en masse*, and attempted an individual poll, but also allowed the jurors to inquire about any matter of interest to them before it discharged the jury. Throughout this entire course of proceedings no juror expressed any reservations about the verdicts. Since the trial court did not foreclose any juror from expressing his dissatisfaction with the written verdicts, the reasoning in *People ex rel. Paul v. Harvey*, is not controlling here.

For the foregoing reasons we affirm the judgment of the circuit court.

Affirmed.

SULLIVAN and BARRETT, JJ., concur.