**Paul LEE, Petitioner,**

v.

**Floyd BENNETT, Superintendent, et al., Respondents.**

**No. 95 Civ. 10753 (CLB).**

United States District Court, S.D. New York.

Feb. 26, 1996.

---

Paul Lee, Beacon, NY, pro se.

Jeanine Pirro, District Atty. of Westchester County, White Plains, NY, for respondents.

### MEMORANDUM & ORDER

BRIEANT, District Judge.

By his pro se petition docketed December 21, 1995, Paul Lee, a state prisoner, seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254 following his conviction in the County Court of the County of Westchester, State of New York, on December 2, 1991.

Petitioner, who was convicted of rape in the first degree in violation of Section 130.35 of the New York Penal Law, appears to have exhausted his state remedies. Specifically, as discussed below, he maintained a direct appeal and two separate post conviction motions in the state court system.

The grounds stated in support of this petition are:

(1) denial of due process because Petitioner did not receive a fair trial due to prosecutorial misconduct;

(2) ineffective assistance of counsel at both the trial and appellate level;

(3) that the verdict was against the weight of the evidence, and

(4) that his statements were improperly admitted in evidence.

Surprisingly for this sort of proceeding, Petitioner also asserts his innocence. None but the first assertion need be considered by this Court, because the rest of the petition is just the usual chaff:

The underlying facts, viewed most favorably to the prosecutor, are as follows. The victim (hereinafter referred to as "J") of the "date-rape" which forms the basis for this conviction was a twenty year old single live-in domestic employed by a family in New Rochelle. On Friday, November 9, 1990, "J" went out on the town in company with two other young women. They went to "Bumpers", a watering hole in New Rochelle patronized by Iona College students, and well known for pickups.[1] It was her plan to spend the night at the home of one of her two friends since her employing family was out of town and their house was dark.

Appellant, a twenty-seven year old single male with a prior criminal record and an alcohol problem, was also at Bumpers. He soon struck up a conversation with "J" and they spent approximately two hours in the bar talking with each other. At the end of that time, Petitioner said he was going to another bar and "J" asked if she could come along with him. Petitioner agreed. On leaving Bumpers, "J" inquired of appellant if she could "crash" on his sofa at his home. Petitioner readily assented and leaving "J's" two girlfriends behind, Petitioner and "J" went to "Gary's", another watering hole across the street from Bumpers.

At Gary's they ordered and received a pitcher of beer and thereafter, for reasons not developed at trial, the bouncer escorted Petitioner out of Gary's. "J" accompanied him outside and they went to a third bar, "Glory Days", where for the first time "J" was denied admittance for want of identification showing proof of age. They then went to a pizzeria together and then by taxi cab to the single family house in New Rochelle where Petitioner resided with his mother.

They entered the home quietly through the back door, into a room occupied by Petitioner furnished with a couch, a mattress on the floor, and a television set.

Thereafter, vaginal sexual intercourse occurred. The fact of intercourse was not disputed at trial. "J" claimed the intercourse took place without her consent and as a result of physical force. A red mark on "J's" throat, the extent and nature of which was hotly contested at trial, was offered as evidence of choking of the victim by the perpetrator prior to the rape.

Thereafter, "J" spent the night in the room with Petitioner and was awakened in the morning by the sound of someone in the kitchen. "J" testified that Petitioner warned her to be quiet and said that if his mother, who was in the kitchen, heard her, she would call her a bitch and a slut and would chase her with a knife. (T: 87). "J" remained in the room with the petitioner until Petitioner left to make a phone call to his friend Jay Ritch. Ritch had met Petitioner through their joint membership in Alcoholics Anonymous; following AA meetings they would both go to bars together to drink and pick up women. (T: 310) Petitioner told Ritch that he had met a girl named "J" at Bumpers the night before and invited Ritch to come over to his house to meet "J". He informed Ritch that he had had sex with "J" the night before then put "J" on the telephone to speak with Ritch. Ritch asked "J" if she had stopped over at Petitioner's home that morning or if she had slept over the previous night and "J" responded that this was none of his business.

Petitioner instructed Ritch to come over to his house as quickly as he could to meet "J", who then telephoned a taxi cab. No cab arrived. Eventually "J" found her way back to the home of her girlfriend with whom she had started out at Bumpers the night before, and went to the hospital complaining to the police that she had been raped.

Petitioner admitted to several of his friends that he had had sex with "J" and "might" have raped her. Conscious of his guilt, Petitioner, after further bar hopping

---

1. Although old enough to marry or to consent to sexual intercourse, "J" could not lawfully be served with alcohol. However, she consumed the "two beers", which are traditionally recited in testimony arising out of incidents in a bar.

the day after the crime, fled to the Westchester County Homeless Shelter at the Airport, where he checked in under an assumed name claiming to be homeless. When arrested on Monday, November 12, 1990, he made false exculpatory statements that he did not know the complainant and had not been in Bumpers on the night of the incident.

*Procedural History*

The first trial ended with a declaration of a mistrial based upon jury deadlock. In some fashion the participants ascertained that the first trial jury, which consisted of seven women and five men had deadlocked six to six with six women voting to acquit.

At the second trial the Petitioner was found guilty of Rape in the first degree and was sentenced to between four and one half and nine years in prison.

The Petitioner thereafter appealed his December 2, 1991 judgment of conviction.

In November of 1993, the Petitioner filed a motion to vacate his judgment of conviction pursuant to C.P.L. Section 440.10. In that proceeding the Petitioner raised five separate grounds for relief. Judge West denied the Petitioner's motion to the extent based on denial of due process during the summation observing that:

> The arguments raised by the defendant may well be valid. Recent decisions including *People v. MacRynolds, [McReynolds]*, 175 A.D.2d 31 [572 N.Y.S.2d 8] [(1991)] and *People v. Romero*, 173 A.D.2d 383 [570 N.Y.S.2d 13] [(1991)] would so indicate. Unfortunately, these allegations concern matters which are clearly on the record and, thus, better dealt with on the defendant's direct appeal which is still pending.

The Petitioner's appeal was submitted to the Supreme Court of the State of New York, Appellate Division of the Second Department. On November 28, 1994, the Appellate Division affirmed the Petitioner's conviction. The Appellate Division found that "the majority of the challenges to the prosecutor's remarks are unpreserved for appellate review.... In any event, the challenged remarks are, for the most part, fair response to the defendant's summation, fair comment on the evidence of the defendant's guilt."

Thereafter, on December 23, 1994, Petitioner made an application to the New York Court of Appeals for review of his case. That application was denied on April 5, 1995.

In March of 1995, the Petitioner made an application Coram Nobis to the Appellate Division, based upon ineffective assistance of counsel. That application was denied on June 12, 1995.

*Discussion*

As an initial matter, this Court must determine if the petitioner has satisfied the exhaustion requirement as dictated by the Supreme Court in *Rose v. Lundy*, 455 U.S. 509, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982). This court finds that he has.

Our Court of Appeals has observed that "The most forthright way to present a constitutional claim to a state court is, of course, to recite the relevant facts and than make an explicit constitutional argument. A habeas petitioner in state court is not required, however, to cite 'chapter and verse' of the Constitution to satisfy the exhaustion rule. Instead, he may fairly apprise the state court of a federal constitutional claim by relying on federal and state cases that employ a constitutional analysis, asserting the claim in terms that 'call to mind a specific right protected by the Constitution,' or alleging facts that fall 'well within the mainstream of constitutional litigation.'" *Levine v. Commissioner of Correctional Services*, 44 F.3d 121, 124 (2nd Cir.1995) (citing *Daye v. Attorney General of the State of New York*, 696 F.2d 186 (2nd Cir.1982) (*in banc*)).

■ In the instant case, the petitioner did not cite "chapter and verse" of the Constitutional amendments applicable to his due process rights, he did however allege facts which "fall well within the mainstream of constitutional litigation". This Court finds that the facts alleged in the petitioner's appellate briefs should have called to mind fundamental due process principles, and as such, fully and fairly apprised the state court of the constitutional issue. See *Holland v. Scully*, 797 F.2d 57 (2nd Cir.1986).

There is no suggestion that the evidence at the first trial was materially different than that produced at the second trial, where the jury consisted of nine women and three men.

At the second trial both attorneys, prosecutor and defense, were women. The trial record suggests some acrimony and mutual disrespect between the attorneys, apparently arising out of pre-existing antagonism rather than this particular case. The trial judge dealt reasonably for the most part with the problems of the trial and attempted to preserve decorum. His rulings appear to have been even-handed and largely correct. Just as there is no perfect crime, there is no perfect trial.

The only error in the trial, and this Court concludes that it is plain error and grievous, is found in the cumulative effect of the prosecutor's summation. The purpose of summations is for the attorneys to assist the jury in analyzing, evaluating and applying the evidence. Deliberate injection of extrinsic or prejudicial matter which has no relevance to the case and no basis in the evidence is not an appropriate element of a prosecutor's summation because it impinges on the jury's function of determining guilt or innocence.

As described by the Supreme Court in *Berger v. United States,* 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935):

> The [prosecuting] Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor—indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

Judge James C. Hill of the Fifth Circuit summarized what is and is not proper for a prosecutor to argue on summation in *U.S. v. Morris,* 568 F.2d 396 (5th Cir.1978):

> Counsel's improper statements in summation is a continuing problem in this Court in civil and criminal jury trials. The purpose of summations is for the attorneys to assist the jury in analyzing, evaluating, and applying the evidence. It is not for the purpose of permitting counsel to "testify" as an "expert witness."

> \*     \*     \*     \*     \*     \*

> These limitations on attorneys' arguments to juries exist for two reasons. First, an attorney's statement of his beliefs impinges on the jury's function of determining the guilt or liability of the defendant. Second, and more important, an attorney's statement of his beliefs injects into the case irrelevant or inadmissible matter or facts not legally produced into evidence. By giving his opinion, an attorney may increase the apparent probative force of his evidence by virtue of his personal influence, his presumably superior knowledge of the facts and background of the case, and the influence of his official position. If, for example, an attorney states in his summation that he believes a witness has lied, his statement suggests that he has private information supporting his beliefs.

> ... The courts require adherence to the proper side of the line whenever the issue is presented, and such issues usually involve transgressions by prosecuting attorneys. That is as it should be, for chances of prejudice are greater when prosecutors transgress. The prosecutor is not just a retained attorney; he is a public official occupying an exalted station. Should he be allowed to "testify" in closing argument, jurors hear the "expert testimony" of a trusted officer of the court on, perhaps, a crucial issue. On the other side may be appointed counsel, laboring valiantly to present all defenses available to the accused, who nevertheless may be unable to respond to the implied challenge by asserting his personal belief in his assigned

client's innocence. The answer is, of course, that the personal conclusions of neither is of any moment; the conclusions to be drawn, by impartial jurors, from the evidence is at issue. (citations omitted.)

After examining the record this Court concludes that the Appellate Division was clearly erroneous in determining that the Petitioner's objections were unpreserved for review and that the prosecutor's remarks were "fair response to the defendant's summation" and "fair comment on the evidence of the defendant's guilt". The transcript of the prosecutor's summation is replete with objections from Mr. Lee's counsel to the highly prejudicial and completely irrelevant comments of the Assistant District Attorney. While many of the objections were sustained, perhaps the most damaging statement was allowed to stand, the objection was overruled and a mistrial motion denied. The objections were as follows:

MS. MURPHY [Prosecutor]: He meets an attractive young woman and he arranges for her to come to his house.

MS. LONG [Defense Counsel]: Objection, your Honor.

THE COURT: Sustained.[2]

(T:884)

MS. MURPHY: She has to talk to the police. She has to have a blood sample, an internal examination, vaginal swabs, cervical swabs, fingernail clippings, hair samples from her head, pubic hair samples.

MS. LONG: Objection, you Honor.

THE COURT: Overruled.

(T:885)

MS. MURPHY: He had this kind of reaction from an employer—from a woman who said she's raped, maybe then, ladies and gentleman, you get a feel for why so many rape cases go unreported in this country.

MS. LONG: Objection, your Honor.

THE COURT: Sustained.

(T:891)

MS. MURPHY: What 27 year old man, 27, disrupts his entire life, chooses to be-

come a fugitive with an alias at a homeless shelter, because a woman makes one isolated, speculative comment, I could report you for rape.

MS. LONG: Objection, your Honor, to the use of an alias—

THE COURT: Overruled.

(T:894)

MS. MURPHY: Ladies and gentlemen, rape cases are never easy for jurors, and I would submit to you that that's mainly because of the subject matter we deal with, and perhaps they're even more difficult for female jurors than they are for male jurors. The fact that conventional wisdom is—

MS. LONG: Objection, your Honor.

THE COURT: Sustained. If you're referring to things in general, refer to this case only.

MS. MURPHY: It might be even more difficult because women like yourselves on this panel—

MS. LONG: Objection, your Honor.

THE COURT: Sustained.

MS. MURPHY: Your Honor, I have to ask for a side bar.

MS. LONG: On the record, please, your Honor.

THE COURT: Yes.

(Whereupon, a side bar discussion was held out of the presence of the jury, as follows:)

MS. MURPHY: Judge, can't I address my remarks directly to these jurors with respect to this case?

THE COURT: You can't, if the earlier part started to talk about the other jurors and the whole cases.

MS. MURPHY: And I'll move off that, Judge.

THE COURT: I know you're trying to move off it. [To Ms. Long] Before I ask for a read back of those last remarks, if I need them, what is your position?

MS. LONG: I just heard the same kind of question being asked, and I tried to nip it in the bud.

2. Viewing the evidence in a light most favorable to the Prosecutor, the testimony adduced at trial was that the victim first asked the petitioner if she could stay at his house that evening.

THE COURT: It seemed to be the same. I know you're trying to move off it, but it seemed to be the same. That's why I ruled the way I did.

There may be some way you can turn it to this case more directly than you have. I have no trouble with that, and haven't suggested how because I'm not certain that would be right, even if I knew how.

MS. MURPHY: Okay.

THE COURT: There must be a way.

MS. LONG: There's just a couple of issues, Judge, for the appellate record.

MS. MURPHY: Not now. I'm in the middle of my summation.

THE COURT: This is just a summation.

MS. MURPHY [sic, undoubtedly Ms. Long]: If I don't put the reason on the record, I waive my rights.

THE COURT: Did you get up during summation about these matters?

MS. LONG: I object[ed], your Honor.

THE COURT: You've preserved it. You can address it later.

(Whereupon, the following now ensued in the presence of the jury:)

MS. MURPHY: *My comment is to the ladies on this particular jury.* (Emphasis added.)

MS. LONG: Objection, your Honor.

THE COURT: *Overruled* at this point. (Emphasis added.)

(T:896–899)

MS. MURPHY: Ladies and gentlemen, don't let her be victimized again.

MS. LONG: Objection, your Honor.

THE COURT: Sustained as to the last remark only.

(T:901)

After the prosecutor finished her summation and the jury was dismissed for the day the following ensued:

THE COURT: The jury is absent counselor.

MS. LONG: If I may, at this point I'm going to move for a mistrial. I think that there were certain comments that were made by Miss Murphy in her summation that drove to the very heart of a fair and just trial.

Some of the objections that I made were sustained, and others were not.

\*　　\*　　\*　　\*　　\*　　\*

Now, with those three subissues aside, the thing that comes out glaring is that now maybe you understand why so many rape cases go unreported in this country. That in and of itself, your Honor, requires a mistrial.

\*　　\*　　\*　　\*　　\*　　\*

Now, then there was the issue about directing a question to women only, and that concerns me, your Honor. I objected to that one. We had a side bar, on the record.

And then last, but not least is don't let her be a victim again.

Judge, if any of these last few—

THE COURT: The last one, don't let her be a victim again?

MS. LONG: There was an objection, and it was sustained. And I believe I heard you say strike it. You might have said strike that. The problem is, Judge, it's already out. It's already out.

THE COURT: Now, just before that, you made reference to the questions or areas directed—

MS. LONG: To women.

THE COURT:—by the prosecutor, where she was directing certain comments to women only on the jury. There, the record will have to, of course, speak for itself. At some point I indicated that the objection was overruled, and then I believe it was repeated in a different fashion.

I sustained the objection, and that's when we got over to side bar.

MS. LONG: Right.

THE COURT: And I indicated on the record there that the way it was going, I preferred that it not go that way, and then the Assistant District Attorney went on to continue her summation, and she did not go in that direction.

MS. LONG: Your Honor, I heard, and correct me if I'm wrong, a question was directed to women with regards to scruti-

nizing, when you're scrutinizing, I direct this question or this question to women when you scrutinize testimony, you know; I don't know what came after that.

But the fact that women—it's almost like a different standard, your Honor, that women might impose a different standard; *if they were being addressed individually,* as if they would scrutinize the evidence any differently. (Emphasis added.)

THE COURT: What I do know, your first objection to it was overruled. Your second objection to it was sustained, and then we had a side bar, and it never happened again after we had the conference at side bar.

MS. LONG: I feel it did. I submit there was a subsequent record of—I'm going to direct this question to the women, don't scrutinize this testimony any differently than something or other, but I submit to you I stood up and objected to that one, but my objection was overruled.

THE COURT: You're not taking about don't let her be a victim.

MS. LONG: No, immediately before that, your Honor.

(T:904–912)

■ This Court finds that contrary to the decision of the Appellate Division, Mr. Lee's challenges to the prosecutor's remarks were preserved as the above record indicates. The record indicates that Ms. Long timely objected to each attempt of the prosecutor to single out the women of the jury. At the close of the summations, Ms. Long promptly requested a mistrial based upon the objections transcribed above as well as other issues. Judge Herold concluded that Mr. Lee waived the issues not contemporaneously objected to and that no error requiring a mistrial occurred as to the issues that were objected to.

■ This Court also concludes, contrary to the decision of the Appellate Division, that the prosecutor's comments were not "fair response to the defendant's summation, fair comment on the evidence of the defendant's guilt", in fact, the comments had nothing whatsoever to do with the defense summation or the evidence presented in this trial.

The summation is rife with prejudicial arguments one after another, clearly intended to arouse passion or engender prejudice, and having little to do with the evidence.

■ In order to prevail on claims of prosecutorial misconduct in this circuit, the misconduct alleged must be so severe and significant as to result in the denial of the petitioner's right to a fair trial. Our Court of Appeals has identified three factors to consider when evaluating such a claim: (1) the severity of the alleged misconduct; (2) the curative measures taken; and (3) the likelihood of conviction absent any misconduct. *U.S. v. Locascio,* 6 F.3d 924 (2nd Cir.1993), *citing Blissett v. Lefevre,* 924 F.2d 434, 440 (2nd Cir.) *cert. denied,* 502 U.S. 852, 112 S.Ct. 158, 116 L.Ed.2d 123 (1991).

■ In analyzing the prosecutor's statements made during summation to determine whether the defendant suffered substantial prejudice, this Court must view the statements in the context of the prosecutor's entire argument to the jury. *United States v. Casamento,* 887 F.2d 1141, 1189 (2nd Cir. 1989) *cert. denied,* 493 U.S. 1081, 110 S.Ct. 1138, 107 L.Ed.2d 1043 (1990). It is clear to this Court, upon consideration of the People's entire summation, that the intent of the prosecutor was to specifically concentrate of the women of the jury and to focus them on matters having little to do with the evidence in this case. The sole contested issue for the jury appears to be whether the People had proved beyond a reasonable doubt that the sexual intercourse occurred without the consent of the "J".

The facts and circumstances bearing on consent are ambiguous. Indeed, they are generally consistent with the William Kennedy Smith case, which was being tried at about the same time and had been widely covered in the public press. The prosecutor referred to the acquittal in that case and sought to distinguish it because unlike the victim in the Smith case, "J" was not newsworthy or socially prominent. This argument was irrelevant as well as prejudicial.

The prosecutor repeatedly interjected items into her summation that were completely irrelevant or totally unsupported by

the evidence. For example, the prosecutor said that Petitioner had threatened "J" with death, a fact not found in the trial evidence;

The prosecutor analogized the mental state of the victim and her failure to leave the house promptly or make a prompt outcry, to the duress experienced by "our flyers shot down over Iraq and captured."

She asserted that Petitioner had met an attractive young women, and "he arranges for her to come to his house." This was totally inconsistent with the evidence, as "J" had initiated the suggestion. At this point an objection was sustained by the trial judge.

"J's" male employer, who testified that her cheerful attitude at work was unaffected following the crime, and that he had observed no red mark on her throat, was attacked as being "completely insensitive"[3], and the prosecutor attributed to his attitude or reaction the reason "why so many rapes go unreported in this Country." This comment was objected to and the objection was sustained.[4]

Then the prosecutor engaged in an emotional and prejudicial appeal directly and solely to the women who constituted the majority of the jurors. She stated that the subject matter was, "even more difficult for female jurors than for male jurors" (here again an objection was sustained), and that, "it might be even more difficult because women like yourselves on this panel". Another objection was sustained.

Then the prosecutor again expressly singled out the women jurors stating, stating, *"my comment is to the ladies on this particular jury."* Here the objection was *overruled,* for reasons which do not appear of record. This ruling is inconsistent with the prior rulings of the trial judge who had sustained earlier objections to similar misconduct. The transcript indicates that Judge Herold was apparently under the misconception that the prosecutor did not again attempt to single out the women on the panel from the men. (See quoted material of trial transcript pgs. 904–112 supra.)

It is grossly improper to address individual jurors or less than all of the members of the jury in summation. This comment and the words that follow appear to have attempted to single out and divide the female jurors from the male jurors. The prosecutor said, (directing her comment directly to the ladies on the jury):

> You may find yourself being extremely critical of the victim in this case, because of the misjudgments she admittedly made in this case.

> But what I'll ask you to consider, while you are evaluating what she did or didn't do, I ask you to consider that in this case, you didn't have to rely solely on the testimony of the victim. It's not just her word against Paul Lee's word. That's not the situation that you have in front of you. (T:899)

Obviously this summation was preconsidered and not extemporaneous; the prosecutor knew at the time that the prior mistrial and jury deadlock had taken place because all but one of the women on the prior jury had voted to acquit. The argument was not a professional exposition of the evidence, but rather a foul blow, based on an express assertion that just the "ladies" of the jury could be addressed with an outrageous appeal to gender bias or an appeal to some special expertise assumed to be possessed only by women.

Courts almost universally agree that it is improper for counsel to single out a particular juror or jurors during summation. See E. LeFevre, Annotation, *Prejudicial effect of counsel's addressing individually or by name particular juror during argument,* 55 A.L.R.2d 1198. The basis for the condemnation of the practice is that it brings to bear a

---

**3.** The word "insensitive" is a current buzz word used on TV talk shows and soap operas to describe masculine reactions to complaints by women. This statement itself was an appeal to gender bias among the jurors.

**4.** At the conference held to consider the mistrial motion made by Mr. Lee's Counsel, the prosecutor attempted to justify this highly prejudicial and completely irrelevant statement, stating:

> I personally do not feel that there was anything improper about the comment. It's fair comment. These are adult people, they can make their own judgments as to whether that's a fair assessment or not.

collateral influence which may tend to prejudice the mind of the juror on the basis of something irrelevant to the real issues of the case. *Id.*

This is not a case where the comments were made and not objected to, *People v. Hartfield,* 137 Ill.App.3d 679, 92 Ill.Dec. 281, 484 N.E.2d 1136 (1st Dist.1985); *Jordan v. State,* 19 Colo. 417, 36 P. 218 (1894); *Balque v. Green,* 193 S.W.2d 705 (Tex.Civ.App.1946), or where an objection was made but the Court made a prompt curative instruction to the jury as in *United States v. Fogg,* 652 F.2d 551 (5th Cir.1981), *reh. den.,* 660 F.2d 499 and *cert. den.,* 456 U.S. 905, 102 S.Ct. 1751, 72 L.Ed.2d 162 (1982) or *People v. Fortson,* 110 Ill.App.2d 206, 249 N.E.2d 260 (1969). In *Fortson,* in which the defendant was on trial for rape, in the course of closing argument the prosecutor stated: 'Ladies of the jury, put yourselves in the place of [the complainant]'. The defendant objected; the court directed the prosecutor to direct his remarks to all of the jurors and the prosecutor stated that he would. The Court in *Fortson* recognized that individual members of the jury should not be singled out by counsel, but concluded that no prejudice occurred to the defendant where the objection was made and the improper argument was immediately corrected.

At Mr. Lee's trial, objections to the offensive summation were promptly made and were initially upheld. When the prosecutor persisted however, the objection was overruled.

This Court cannot say that the prejudice that resulted was harmless in that there was overwhelming evidence of the Petitioner's guilt. This appears to have been a close case. The six to six deadlock of the prior jury panel confirms that the evidence against the Petitioner is not overwhelming.

It might well be that if the timely objection to this manner of address to the jury had been sustained as it should have been, rather than overruled, and if the jury had been cautioned to disregard the argument and decide the case on the evidence or lack thereof, this Court could find refuge in the doctrine of harmless error. However, by overruling the objection to this specific address only to the "ladies of the jury", the prosecutor was allowed by the trial court by this and other remarks, to create an unwholesome atmosphere in which it could hardly be expected that the jury deliberations would concentrate on the facts.

This misconduct having so infected the search for truth, this Court concludes as a matter of law that the conviction in the second trial justifies no confidence in its reliability. Due process rights of Petitioner to a fair trial were violated.

The petition for the writ of habeas corpus is granted, unless the State of New York retries the indictment against Petitioner within sixty (60) days. If a timely appeal is taken to the Court of Appeals for the Second Circuit, this order shall be stayed either pending the outcome of that appeal or the further order of the Court of Appeals.

The Clerk shall enter judgment.

SO ORDERED.